IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KENDRA ROSS,

        Plaintiff,

v.

ROYALL JENKINS, et al.,

        Defendants.

Case No. 17-2547-DDC-TJJ

## MEMORANDUM AND ORDER

Plaintiff Kendra Ross seeks default judgment against defendants Royall Jenkins, The Value Creators, Inc. (f/k/a The United Nation of Islam, Inc.), The Value Creators LLC, and The Value Creators, Inc.  Doc. 23.  The court held a hearing on plaintiff's motion on February 2, 2018.  Plaintiff testified at the hearing and presented other evidence.  Plaintiff's licensed clinical social worker also testified at the hearing.  Plaintiff asked the court to enter a default judgment against defendants on all her claims.  Plaintiff also made a damages request at the hearing, asking the court to award her damages for restitution, emotional distress, punitive damages, liquidated damages, treble damages under RICO, and damages for conversion.  Finally, plaintiff asked for reasonable attorneys' fees and costs.  Doc. 34.

After carefully considering the evidence adduced at the February 2, 2018 hearing and plaintiff's submissions, the court grants plaintiff's Motion for Default Judgment (Doc. 23) against all defendants and her Motion for Attorneys' Fees (Doc. 34).  The court awards plaintiff $453,517.20 in restitution damages, $2,920,000 in emotional distress damages, $3,373,517.20 in punitive damages, $282,677.50 as liquidated damages, $907,034.40 for trebled damages under

RICO, and $1,800 as conversion damages.  The court also awards plaintiff $117,184.34 for reasonable attorneys' fees and costs.

## I.      Procedural Background

On September 15, 2017, plaintiff Kendra Ross filed a Complaint against Royall Jenkins, The Value Creators, Inc. (f/k/a The United Nation of Islam, Inc.), The Value Creators LLC, and The Value Creators, Inc. Doc. 1.  The Complaint asserts 16[1] federal and state law claims.  The federal claims include violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1589, 1590, and 1595, for human trafficking and forced labor; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., for unpaid wages; and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961.  The state law claims consist of three categories:  (1) violations of human trafficking laws; (2) violations of minimum wage laws; and (3) violations of Kansas tort and quasi-contract law.  Plaintiff asserts that defendants violated Kansas, New York, New Jersey, and Ohio human trafficking laws.  Plaintiff also claims that defendants violated minimum wages laws for those same states.  Finally, plaintiff alleges that plaintiff violated Kansas laws for conversion, unjust enrichment, and both intentional and negligent infliction of emotional distress.

Plaintiff served the Complaint on defendant Royall Jenkins on September 21 and 25, 2017.  *See* Docs. 9 & 10.  Plaintiff served the Complaint on defendants The Value Creators, Inc. (f/k/a The United Nation of Islam, Inc.), The Value Creators LLC, and The Value Creators, Inc. (collectively, "The Value Creators") on September 18 and 20, 2017.  *See* Docs. 11–13, 15–17.

Defendant Royall Jenkins filed a Motion for a Writ of Certiorari on October 11, 2017. Doc. 18.  Magistrate Judge Teresa J. James denied defendant's motion, and noted that

---

[1]     It appears the Complaint unintentionally omitted Count VIII.  Doc. 24 at 23 n.20.  So, the claims skip from Count VII directly to Count IX.

defendant's motion did not meet the requirements of the Federal Rules of Civil Procedure to qualify as a timely Answer or other response.  The other defendants have not appeared.

On October 23, 2017, plaintiff filed an Application for Clerks Entry of Default against all defendants (Doc. 20).  The following day, the Clerk entered default against all defendants under Federal Rule of Civil Procedure 55(a) (Doc. 22).

Plaintiff now asks the court to enter a default judgment against all defendants under Rule 55(b)(2), awarding her damages and attorneys' fees.

## II.    Legal Standard

Federal Rule of Civil Procedure 55 provides a two-step process for securing a default judgment.  First, Rule 55(a) allows the Clerk to enter a default against a party who "has failed to plead or otherwise defend" a lawsuit.  Second, after the Clerk enters default, plaintiff may request the Clerk to enter judgment if the amount sought is "a sum certain or a sum that can be made certain by computation."  Fed. R. Civ. P. 55(b)(1).  But when, as here, a plaintiff's claim is not for a sum certain or a sum made certain by calculation, plaintiff must apply to the court for a default judgment under Rule 55(b)(2).  When considering a motion for default judgment, the court may hold a hearing if "it needs to (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter."  Fed. R. Civ. P. 55(b)(2).

"Once the default is established, defendant has no further standing to contest the factual allegations of plaintiff's claim for relief."  *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F. Supp. 3d 1269, 1274 (D. Kan. 2016) (citations and internal quotation marks omitted).  The court accepts as true all well-pleaded factual allegations in the Complaint.  *Id.*  This does not extend, however, to allegations about the amount of damages.  *Id.*

But, even after default, "'it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010) (quoting 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2688, at 63 (3d ed. 1998)).  When deciding whether to enter a default judgment, a district court enjoys broad discretion.  *Mathiason*, 187 F. Supp. 3d at 1274.

A default judgment also does not establish the amount of damages.  *Id.* at 1274–75. Instead, "[p]laintiff must establish that the amount requested is reasonable under the circumstances."  *Id.* at 1275 (citing *DeMarsh v. Tornado Innovations, LP*, No. 08-2588-JWL, 2009 WL 3720180, at *2 (D. Kan. Nov. 4, 2009)).  A court may award damages "'only if the record adequately reflects the basis for [the] award via a hearing or a demonstration by detailed affidavits establishing the necessary facts.'"  *DeMarsh*, 2009 WL 3720180, at *2 (quoting *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) (further citations and internal quotation marks omitted)).

## III.   Findings of Fact

### A.   Defendant Royall Jenkins

Before 1978, Royall Jenkins was a member of the Nation of Islam under the leadership of Elijah Muhammad.  Dr. Louis Farrakhan assumed leadership of the Nation of Islam when Elijah Muhammad died in 1978.  Mr. Jenkins asserts that, around the time of Elijah Muhammad's death, angels and/or scientists abducted him, escorted him through the galaxy in a spaceship, and informed him he was "The Supreme Being."  During his abduction, Mr. Jenkins asserts, these beings instructed him how to govern Earth.

When he "returned to Earth" in 1978, Mr. Jenkins split from Nation of Islam and informally organized the United Nation of Islam ("UNOI") as a radical alternative to Dr. Farrakhan's Nation of Islam.  Since that time, Mr. Jenkins has ordered his UNOI followers to refer to him as "Allah on Earth," "Allah in Person," or "The Supreme Being."

Sometime around 1996, Mr. Jenkins founded "Heaven"—a UNOI model community in an economically-disadvantaged neighborhood in Kansas City, Kansas.  Mr. Jenkins later established additional UNOI communities in other places across the United States, including: Atlanta, Georgia; Dayton, Ohio; Newark, New Jersey; Harlem, New York; Temple Hills, Maryland; Mobile, Alabama; and Cincinnati, Ohio.  The Value Creators now own the personal, real, and intellectual property used by these communities in the nation-wide trafficking scheme at issue in this case.

Mr. Jenkins has a large immediate family scattered around the United States.  He has had at least 13 wives, and has fathered about 20 children (collectively, the "Royall Family").  Mr. Jenkins calls some of his wives "concubines."  Royall Family members reside in different locations across the United States.

Mr. Jenkins has owned several houses on one street in Kansas City, Kansas, where his wives, children, and grandchildren have resided.  Also, Mr. Jenkins has owned a house called the "House of Peace" in Kansas City, Kansas.  The "House of Peace" is in a secret location, only accessible by Mr. Jenkins and a few select people.

Mr. Jenkins holds ownership interests in several businesses, including all three business entities collectively referred to as The Value Creators.  Mr. Jenkins and the rest of the Royall Family directly have benefitted financially from the revenues of these businesses, in large part because the businesses employ trafficked laborers who are not paid any wages for the work

5

they perform.  They also have derived financial benefits from the trafficked laborers who are paid no wages for providing around-the-clock child care and housekeeping work to the Royall Family.

While plaintiff was a member of the UNOI community, Mr. Jenkins was the business and spiritual leader of UNOI and head of the Royall Family.  He personally made all the decisions about the trafficked laborers which benefitted UNOI, the Royall Family, and Mr. Jenkins himself.

**B.   UNOI**

**1.   Organization**

UNOI operated as the corporate entity for Mr. Jenkins's cult while trafficking plaintiff. UNOI employed a hierarchical chain of command, starting with Local Secretaries at the bottom; the National Secretary, Officers, Captains, Lieutenants, and the National Lieutenant in the middle; and Mr. Jenkins at the top.  Everyone in the chain of command ultimately reported to Mr. Jenkins.  Mr. Jenkins approved almost everything, if not everything, that happened in "his Nation."

UNOI divided its membership into two groups:  (1) "part-time" followers, who have a life or job outside of UNOI community; and (2) "full-time" followers, who work for UNOI, live in homes owned and operated by UNOI, and interact only with other UNOI followers.  UNOI afforded "full-time" followers a more respected status and fully included them in all activities. UNOI leaders put followers on "part-time" status as a form of punishment.  UNOI subjected "part-time" followers to full-body searches before permitting them to enter UNOI meetings. Individuals who UNOI demoted to "part-time" status could regain "full-time" status by various

demonstrations of penance, including formal apologies expressing shame and contrition to UNOI leaders.

UNOI employed a strict discipline system that Mr. Jenkins primarily developed, approved, and enforced.  Under this system, individuals could receive "Class A" discipline for severe misconduct (*e.g.*, talking back to superiors or using an incorrect tone).  Followers subjected to "Class A" discipline were not permitted to speak freely to anyone and, instead, had to ask permission of the individual to whom they wished to speak.  The punishment period could range from 15 days to indefinitely.  Also, followers subjected to "Class A" discipline often were forced to fast.

Individuals could receive "Class B" punishment for moderately severe misconduct (*e.g.*, playing too much, not cleaning one's bedroom, failing a home inspection).  Followers subjected to "Class B" discipline endured public censure during meetings.  Also, they often were forced to fast.

Individuals could receive "Class C" punishment after Class A or Class B punishment as a parole mechanism.  Individuals who received "Class C" punishment were observed more closely for UNOI violations for about 30 days.

Individuals could receive "Class F" punishment for extremely severe misconduct (*e.g.*, being overweight, child molestation).  UNOI banished followers subjected to "Class F" discipline.

### 2.    UNOI Doctrine

UNOI doctrine primarily focused on the supremacy of Mr. Jenkins as God on Earth. UNOI disciples thus considered Mr. Jenkins's teachings as prophetical.  Mr. Jenkins's teachings emphasized and prioritized the differences between the races and genders.  Mr. Jenkins claims

that the "Black Man" is superior to the "White Man," and that the "Black Man" created the "Black Woman" as a natural pleasure.  Mr. Jenkins also teaches that women are inferior to men and, to escape eternal damnation, women should completely submit to men.

These basic teachings mandated a regimented and controlled family organizational structure within UNOI.  UNOI required female members to attend regular women's meetings, where women learned how to be "good housewives" and how to "submit" to their husbands. UNOI required male members to attend regular men's meetings, where they learned how to lead and direct their wives and children.  Mr. Jenkins is the primary author of the educational materials for both the women and men's gender role meetings.

UNOI monitored women's body weights closely.  UNOI weighs women every Sunday before services.  If a "full-time" female member was over an "ideal" weight, UNOI required her to fast.  If a "part-time" female member was over an "ideal" weight, UNOI required her to pay a fee. Women were forced to meet with a psychic "doctor" to discuss their nutritional needs and diet.

UNOI controlled the language that members were permitted to use.  For example, members were not permitted to say, "Bless You," "Please," or any words that began with the letter "P."  UNOI instructed members to say "however" instead of "but," and to say "share with" instead of "told."

UNOI employed an extensive system for courtship and marriage.  Under this system, men submitted "bids" on women to Mr. Jenkins through his chain of command in the organization.  UNOI's chain of command either approved or rejected these bids as they moved up to Mr. Jenkins.  Mr. Jenkins ultimately approved or rejected the bids already approved by his lower deputies.  Mr. Jenkins's reasons for rejecting bids were often as simple as the individuals

were "not meant for each other."  There were no minimum age limits or restrictions for marriage among UNOI members.

Once approved, the men engaged the women in three distinct stages of courtship.  First, men were instructed to send an email to UNOI leadership with a list of women they wished to court.  The leaders then would forward that email to a psychic doctor who, he claimed, knew which members were compatible with each other.  Then, the psychic doctor would notify UNOI's leadership of his decisions about compatibility.  After a man selected a woman from this list, they would start "interviewing" (*i.e.*, dating).  At first, couples only could talk on the phone and in person.  Then, they were permitted to have physical contact with one another, but no sexual contact.

The entire courtship process typically lasted five months.  If the union was permitted by UNOI leadership, the final step in this process was marriage.  UNOI members married without securing government-issued marriage licenses.

### 3.      Education of Children and Adolescents within UNOI

Mr. Jenkins authored the central literature for UNOI, including the children's education curriculum.  This literature included some original teachings from Elijah Mohammed and some literature authored by Mr. Jenkins.

UNOI did not send its children and adolescent members to public school.  Instead, it required their attendance in UNOI's own education system.  Mr. Jenkins's teachings asserted that public school systems are corrupt.  UNOI's education system did not include properly certified teachers or teaching curriculum.  If individuals excelled in a subject area, UNOI would appoint them as teachers in that subject.  UNOI's education system included courses about Mr. Jenkins's literature, science, and math.  Mr. Jenkins's teachings permeated all subjects in the

children's education curriculum.  Courses often ended abruptly, and did not follow a schedule or syllabus.  During UNOI classes, young students were shown horror films such as "The Omen" and "Crazy as Hell."

UNOI ran a school called the "University of the Art and Logistics of Civilization." UNOI required all "full-time" members to attend this "University."  Many other UNOI members attended classes by listening to Mr. Jenkins's recordings or conference calls led by other cult leaders in the living room of the home where they lived.

The disciplinary system at UNOI schools involved paddling children for infractions, even accidental ones.  For example, if a child accidentally touched one of Mr. Jenkins's children or grandchildren, they were beaten.

### 4.    Working in UNOI

UNOI forced its members to work in various businesses it owned, *e.g.*, restaurants, bakeries, supermarkets, gas stations, a sewing factory, and a construction company.  Specifically, UNOI ran a business called "Food for Life Supreme."  The Value Creators currently owns and operates Food for Life Supreme, with locations in Atlanta, Georgia; Newark, New Jersey; Harlem, New York; Temple Hills, Maryland; Dayton, Ohio; Cincinnati, Ohio; Mobile, Alabama; and Kansas City, Kansas.  UNOI members worked at UNOI businesses but UNOI never paid them for the work they performed.

Many members, including plaintiff, worked every day of the week without breaks.  Many members worked at UNOI business and schools for eight-hour shifts during the day and then were expected to perform additional work—cooking, cleaning, childcare—when they returned to the home where they lived.  Several teenage members lived with UNOI heads of household, and the heads of household would dictate their labor responsibilities for the home.

UNOI controlled where and when members went to the supermarket and which groceries they could buy.  UNOI maintained a list of approved grocery stores and approved items for members to buy.  Members were required to submit a grocery list for approval during communal shopping runs.  Many UNOI members, including plaintiff, received food stamps from the federal government.  All "full-time" members had to surrender their Electronic Benefit Transfer ("EBT") cards to UNOI leaders, and UNOI rationed funds from those cards by household, controlling members' budget allowance from the federal government.  Members did not receive a ration that was equivalent to the ration provided to them individually through the EBT cards.

### 5.      Health Care for Members of UNOI

UNOI did not provide its members with any health insurance.  UNOI also did not allow its members to receive medical care offered by individuals outside of UNOI.  Instead, UNOI limited its members to medical care provided by an individual named Dr. Marvin MacIntosh.  He treated all medical issues (*e.g.*, obstetrics, gynecology, minor emergency medicine, and pediatrics) experienced by UNOI members.

### 6.      The Value Creators

Around September 2011, Mr. Jenkins began changing his teaching on key doctrines such as death and free will.  Mr. Jenkins said UNOI would "be tested" and that he individually was "going through a testing period."  At the same time, UNOI's chain of command began to dissipate, and Mr. Jenkins moved to Arizona, which he called "the land of peace."  Following this "testing period," Mr. Jenkins and other leaders organized The Value Creators entities.

In April 2015, Mr. Jenkins and others established The Value Creators as a successor in interest to UNOI.  The Value Creators is effectively UNOI but using a different name, and it includes all the same (or similar) businesses and members.  The Value Creators essentially

maintains the same doctrines, chain of command structure, "employment" practices, educational

mandates, and health care directives the UNOI employed.

### C. Plaintiff Kendra Ross

In 1991, Plaintiff Kendra Ross was born in Memphis, Tennessee.  At the age of two, she

moved to Atlanta, Georgia with her mother.  Shortly after settling in Atlanta, the local UNOI

temple leader introduced plaintiff's mother to UNOI.  Plaintiff's mother, and therefore plaintiff,

joined UNOI around that time.

From age two until age 11, plaintiff and her mother were "part-time" members of UNOI,

meaning they participated in UNOI but lived outside the organization.  When she was nine years

old, plaintiff began cooking and packaging food for UNOI fundraisers.  UNOI received the

proceeds from these fundraisers.  Plaintiff received no compensation for this work.  Plaintiff

attended public school in the Atlanta area through the fifth grade.

### 1. Kansas City, Kansas

In 2002, at the age of eleven, plaintiff and her mother moved to Kansas City, Kansas.

There, they were elevated to "full-time" status members of UNOI.  Around that time, UNOI

commanded plaintiff's mother to remove plaintiff from public school and to send her to a UNOI-

run school.  Plaintiff's mother obeyed the command.

At that time, a UNOI Secretary forced plaintiff to work at a UNOI-run bakery and

restaurant for a few hours before school and a full eight-hour shift after school.  UNOI also

forced plaintiff to sell baked goods and work at catering events for UNOI.  After working in the

bakery, plaintiff worked in a UNOI home, performing such work as cooking and cleaning, and

providing childcare.

The next year, Mr. Jenkins ordered that plaintiff be removed from her mother's home, and directed that she go live in a UNOI women's household.  This household consisted of a few women with young girls, other girls around plaintiff's age, and plaintiff's sister.  During this time, UNOI forced plaintiff to maintain a strict diet of rice, beans, fruit, and salad.  So, plaintiff became severely malnourished.  Plaintiff was not permitted to see a licensed doctor or otherwise receive medical attention for her malnourishment.

From the age of 11 through the age of 14, plaintiff worked about 8,320 hours at the bakery, and about 2,080 hours as a maid.  The prevailing wages at that time for Kansas City were $11 per hour for bakery services and $9 per hour for cleaning services.  But UNOI did not compensate plaintiff for any of this work.

At the age of 15, UNOI removed plaintiff from UNOI-run school so she could work at a UNOI-owned and operated diner and teach younger UNOI students.  At the diner, she prepared and cooked food.  UNOI never permitted plaintiff to attend any school, UNOI-sponsored or otherwise, after age 15.  Plaintiff worked about 2,600 hours at the diner in 2006 and 2007.  The prevailing wages at that time for a diner cook in Kansas City were $12 per hour.  UNOI never compensated plaintiff for any of this work.

During a UNOI celebration, Ayesha Mohammad, one of Mr. Jenkins's wives, publicly called plaintiff and others to gather on a stage and announced where each of the individuals would be shipped to work.  Plaintiff did not have any prior notice of this forced relocation.  Plaintiff moved to Atlanta within two days of that announcement.

### 2.      Atlanta, Georgia

When UNOI moved plaintiff to Atlanta, Georgia, plaintiff's mother and sister were placed on "part-time" status and were living together.  Plaintiff's mother did not know that plaintiff would be moving to Atlanta.

While in Atlanta, plaintiff was forced to work full-time in a restaurant owned and operated by UNOI without any pay.  Her work consisted of preparing food for the restaurant and baking pies, cakes, and other pastries.

While working at the restaurant in Atlanta, plaintiff severely cut her finger.  She was not given any medical attention except for two band-aids to stop the bleeding.

While in Atlanta, plaintiff lived in one of Mr. Jenkins's family homes.  The residents of the home included one of Mr. Jenkins's wives, one of his concubines, the husband and son of the concubine's sister, another couple, and about 12 other minors.  After plaintiff returned home from the restaurant, UNOI forced her to prepare food, cook, and clean for this household of about 15–18 people.

Plaintiff lived in Atlanta for four or five months.  During the five months she was there, plaintiff worked about 1,320 hours as a cook at the restaurant, and about 308 hours as a house cook and maid.  The prevailing wages at that time in Atlanta were $12 per hour for restaurant cooking services and $10 per hour for maid services.  UNOI did not compensate plaintiff for any of this work.

UNOI sent plaintiff back to Kansas because, according to UNOI officials, she did not have the "proper attitude."

### 3.    Back to Kansas City, Kansas

In Kansas City, plaintiff lived in a UNOI home with a few younger women, men, and couples.  The caretaker of the home physically and emotionally abused plaintiff.  Although she reported several injuries, UNOI did not permit her to see a licensed medical professional.

Also during this time, plaintiff worked at a diner making meals for 25 single UNOI men. And she provided childcare for the children in the home.  Plaintiff typically would arrive at the diner at 8:00 a.m. and work until 5:00 p.m., seven days a week.  She also waited tables, but was not permitted to keep her tips.  When she returned home, plaintiff cleaned, cooked, and served everyone until 8:30 p.m. or 9:00 p.m. each night.

Mayesha Jenkins, the granddaughter of Royall Jenkins, called plaintiff while she was living in Kansas to tell her that she was moving to Newark, New Jersey.  UNOI moved plaintiff to New Jersey a few days after she received this phone call.

During her time in Kansas City, plaintiff worked about 6,552 hours at the diner, and about 2,184 hours as a maid.  The prevailing wages at that time in Kansas City were $12 per hour for her services at the diner and $10 per hour for her housemaid and childcare services. UNOI never compensated plaintiff for any of this work.

### 4.    New Jersey and New York

In April 2009, when plaintiff was 17, defendants forcibly moved her to New Jersey, where she worked in restaurants in Newark, New Jersey, and Harlem, New York.  She prepared food, grilled, cooked, and waited tables for the restaurant.  UNOI did not permit plaintiff to keep her tips; it confiscated them.

While plaintiff worked in UNOI restaurants in New Jersey and New York, UNOI leaders expressed concern about government officials discovering minors working at their restaurants.

15

UNOI leaders instructed plaintiff and others to avoid any child labor investigators.  If the child labor investigation team visited the restaurant, plaintiff was instructed to leave and "take a walk."

Beside her work at UNOI restaurants, UNOI forced plaintiff to cook for an entire household of about 25 UNOI members.

During her time in New York and New Jersey, plaintiff worked about 1,820 hours as a cook at the restaurant, and about 156 hours as a maid and house cook.  The prevailing wages at that time in the New York City area were $14 per hour for her bakery services and $12 per hour for her cleaning services.  Plaintiff was not compensated for any of this work.

While in New Jersey, Maryum Mohammed—a "full-time" member of UNOI—reported plaintiff for failing to clean a blender in the restaurant.  Plaintiff received a disciplinary phone call from a UNOI leader for this infraction.

UNOI leaders told plaintiff that she had to leave New Jersey because she did not have the "right spirit."  The next day, UNOI leaders forced plaintiff onto a UNOI delivery truck to move.

### 5.        Dayton, Ohio

In 2009, at the age of 18, UNOI forcibly moved plaintiff to Dayton, Ohio.  In Dayton, plaintiff lived in a group home, then with Mr. Jenkins and his family, and later with a UNOI couple who had been demoted to "part-time" status.  While living with Mr. Jenkins and his family, plaintiff was forced to clean the entire house.

In Dayton, plaintiff worked for another UNOI restaurant.  Her duties included preparing food and cooking for the carry-out and community customers.  She worked six days per week, beginning at 6:00 a.m. in the morning and at times working as late as 11:00 p.m.  Other than Sundays, plaintiff never took a single day off work while she was in Dayton.

During her time in Dayton, plaintiff worked about 2,652 hours at the restaurant, and about 78 hours as a maid.  The prevailing wages at that time for Dayton were $12 per hour for her restaurant cooking services and $10 per hour for her cleaning services.  Plaintiff was not compensated for any of this work.

While in Dayton, the government issued plaintiff a $150 per month food subsidy. Every month she lived in Dayton, UNOI confiscated plaintiff's subsidy for its own use without her consent.

### 6.      Probation and Expulsion

In 2009, UNOI demoted plaintiff to "part-time" status after she refused to drink bloodroot—a gin-based drink.  Her refusal was reported to Mayesha Jenkins.  Ms. Jenkins told plaintiff that she had three days to find somewhere else to live, and that she would be placed on "part-time" status.

Later that same year, UNOI placed plaintiff on "away from us indefinitely" status and forcibly moved her to Tennessee.  There, she lived with her aunt (a non-UNOI member).  This was the first time that plaintiff lived with a non-UNOI member since age two.

### 7.      Coercion Back to UNOI

During the time plaintiff was on "indefinitely away from us" status, UNOI did not allow plaintiff to have any contact with her mother, sisters, or friends—all of whom were members of UNOI.  So, plaintiff was alone because every person in her life from age 11 was a UNOI member.

UNOI obstructed plaintiff's communications with her friends and family to coerce and control plaintiff into rejoining UNOI.  Specifically, UNOI understood that a member who was

"away from us" would feel enormous pressure to rejoin UNOI because the UNOI community was so dissociated from mainstream American society.

In April 2010, feeling pressure to rejoin the only life she knew, plaintiff told leaders of the organization that she "wanted to make her record right with Allah," and had "learned her lesson." UNOI permitted plaintiff to move back to Dayton, Ohio, where she lived with her sister and continued to work at a UNOI restaurant without pay.

For the next two years, plaintiff worked about 10,608 hours at the restaurant, and about 312 hours as a maid. At that time, the prevailing wages in Dayton were $12 per hour for her cooking services and $10 per hour for her cleaning services. Plaintiff, however, was not compensated for any of this work.

### 8.      Marriage

At age 20, UNOI facilitated a marriage between plaintiff and another UNOI member through a psychic doctor. On October 10, 2011, plaintiff's UNOI marriage became official by UNOI terms. Plaintiff was forced to do all the cooking, cleaning, and housework in the home she shared with her UNOI husband. UNOI husbands, including the individual to whom UNOI arranged a marriage for plaintiff, regularly practiced polygamy. Plaintiff is no longer in a marriage recognized by the defendants. Plaintiff is not, and never has been, in a legal marriage.

### 9.      Escape from UNOI

Plaintiff's painful ordeal ended only when UNOI began to fracture and she received guidance from outside family members and non-profit organizations that had learned of plaintiff's treatment. In 2012, at the age of 21, plaintiff gathered her courage and strength to escape from UNOI.

In 2014, plaintiff was diagnosed with post-traumatic stress disorder ("PTSD") resulting from her trafficking experiences.  While she can control her PTSD and emotional health with properly-prescribed treatment, she still suffers from the psychological effects of her childhood trafficking.

## IV.     Conclusions of Law

### A.     Subject Matter Jurisdiction

"Before it may enter default judgment, the Court has an affirmative duty to determine whether it has subject matter jurisdiction."  *Olivas v. Bentwood Place Apartments, LLC*, No. 09-4035-JAR, 2010 WL 2952393, at *6 (D. Kan. July 26, 2010) (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)).  Federal courts have original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  And, 28 U.S.C. § 1367 provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) (holding that a district court has "[p]endent jurisdiction"—now called supplemental jurisdiction—over state law claims in a case if subject matter jurisdiction exists over the federal claims and the "state and federal claims . . . derive from a common nucleus of operative fact.").

Here, plaintiff asserts claims under three federal acts—TVPRA, FLSA, and RICO.  Plaintiff's lawsuit thus arises under federal law, and the court has subject matter jurisdiction under 28 U.S.C. § 1331.  Plaintiff also asserts claims under state laws.  Those state law claims

derive from the same operative facts as the federal claims.  The court thus has supplemental jurisdiction over plaintiff's state law claims under § 1367.

> **B.      Personal Jurisdiction**

A court also must have personal jurisdiction over a defendant before it can enter a default judgment against him.  *Bixler*, 596 F.3d at 761.  In a federal question case, like this one, a court can assert personal jurisdiction over a defendant if:  (1) the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant; and (2) the exercise of jurisdiction comports with due process.  *Klein v. Cornelius*, 786 F.3d 1310, 1317 (10th Cir. 2015) (quoting *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1209 (10th Cir. 2000) (further citations omitted)).

RICO provides for nationwide service of process.  *See* 18 U.S.C. § 1965(b) ("In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof."); *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006) *cert. denied*, 550 U.S. 918 (2007) ("When a civil RICO action is brought in a district court where personal jurisdiction can be established over at least one defendant, summonses can be served nationwide on other defendants if required by the ends of justice.").  In other words, the court properly can exercise personal jurisdiction over defendant Royall Jenkins, an Arizona resident,[2] if:  (1) it has personal jurisdiction over at least one other defendant in this action; and (2) the exercise of jurisdiction over Mr. Jenkins satisfies the ends of justice.

---

[2]      Plaintiff's Complaint alleges that defendant Royall Jenkins is a resident of Arizona.

Plaintiff's Complaint makes four allegations that demonstrate the court has personal jurisdiction over The Value Creators, Inc. (f/k/a The United Nation of Islam, Inc.), The Value Creators, LLC, and The Value Creators, Inc.  They are:  (1) UNOI formally changed its name in Kansas to The Value Creators, Inc; (2) UNOI is a Delaware Corporation with its principal place of business[3] in Kansas; (3) The Value Creators, LLC has three members—Royall Jenkins, Ephriam Woods, and William Green; and (4) Mr. Woods is a resident of Kansas.  These allegations establish that The Value Creators, Inc. is a resident of Kansas.  *See Newsome v. Gallacher*, 722 F.3d 1257, 1267 (10th Cir. 2013) ("[A] corporation is considered domiciled where it is incorporated and where it has its 'principal place of business'").  The allegations also demonstrate that The Value Creators, LLC is a resident of Kansas.  *See Siloam Springs Hotel, LLC v. Century Sur. Co.*, 781 F.3d 1233, 1234 (10th Cir. 2015) ("[A]n LLC, as an unincorporated association, takes the citizenship of all its members.").  Because defendants The Value Creators, Inc. (f/k/a The United Nation of Islam, Inc.), The Value Creators, LLC, and The Value Creators, Inc. are residents of Kansas, the court has personal jurisdiction over them.  The court now must determine if exercising personal jurisdiction over defendant Royall Jenkins will serve the ends of justice.

"The 'ends of justice' is a flexible concept uniquely tailored to the facts of each case." *Cory*, 468 F.3d at 1232.  Our Circuit has elaborated on the ends of justice idea embraced by RICO, explaining:

> RICO was intended as a means to eradicate organized crime.  That purpose is not furthered by withholding  nationwide service of process whenever  all  of the RICO defendants could be haled into one court for a single trial.  While the district court's construction of the "ends of justice" might promote judicial economy, it might also mean that some RICO violations would go unpunished

---

[3]   The Supreme Court defines principal place of business as "the place where a corporation's officers direct, control, and coordinate the corporation's activities."  *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010).

> whenever organized criminals operate within the same locale and cause harm in a distant state. Insulating such a criminal enterprise from liability, when, for instance, the victim is unable to finance long-distance litigation, is not consistent with RICO's purpose.

*Id.* (citation omitted).

The court finds that the ends of justice are satisfied by the court exercising personal jurisdiction over defendant Mr. Jenkins. The defendant organizations reside in Kansas. The ends of justice require that the leader of those organizations—Royal Jenkins—be haled into court in the locale where he established those organizations. The ends of justice also require that defendant Mr. Jenkins be brought to justice in one of the states where he harmed plaintiff. Kansas is the best location because the other defendants are residents of the state.

Also, to the court's knowledge, Mr. Jenkins is the only defendant with any contacts in Arizona. And the court is unaware of any harm inflicted by the defendants on plaintiff while in Arizona. On balance, the facts pertinent to Mr. Jenkins convince the court that exercising personal jurisdiction in Kansas will serve the ends of justice.

### C.     Liability

In the following subsections, the court analyzes defendants' liability under the various theories plaintiff alleges. The court concludes that the well-pleaded facts in the Complaint and plaintiff's testimony at the February 2, 2018 hearing establish defendants' liability for all plaintiff's allegations. And defendants' various violations entitle plaintiff to recover damages and attorneys' fees. The court discusses these two topics in their own sections following its liability analysis.

### 1.     Under the TVPRA (Counts I and II)

Plaintiff's Complaint alleges two violations of the TVPRA—forced labor and human trafficking.

### a.   Forced Labor

The well-pleaded facts alleged by the Complaint and corroborated by plaintiff's testimony at the February 2, 2018 hearing establish a violation of the TVPRA for forced labor. Defendants violated both subsections (a) and (b) of § 1589 of the TVPRA.

To prevail on a claim under § 1589(a), a plaintiff must establish that the defendant knowingly acquired plaintiff's labor by means and/or threats of: (1) force and physical restraint; (2) serious harm, including psychological and financial harm; (3) abuse of the legal process; or (4) a scheme intended to cause the plaintiff to believe that if she did not perform the labor or services, she would suffer serious harm. *See* 18 U.S.C. § 1589(a); *see also Aguilera v. Aegis Commc'ns Grp., LLC*, 72 F. Supp. 3d 975, 977–78 (W.D. Mo. 2014); *United States v. Sabhnani*, 539 F. Supp. 2d 617, 629 (E.D.N.Y. 2008), *aff'd*, 599 F.3d 215 (2d Cir. 2010).

When assessing whether harm is sufficiently "serious" to satisfy the TVPRA, "the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that cause another to acquiesce in providing forced labor." *David v. Signal Int'l, LLC*, No. 08-1220, 2012 WL 10759668, at *19–20 (E.D. La. Jan. 4, 2012). For this reason, it is "irrelevant" whether a trafficking victim actually "had the opportunity to escape." *Ramos v. Hoyle*, No. 08-21809-CIV, 2008 WL 5381821, at *5 (S.D. Fla. Dec. 19, 2008). Instead, the relevant inquiry is whether the defendant "intentionally cause[d] the oppressed person reasonably to believe, given her special vulnerabilities, that she ha[d] no alternative but to remain in involuntary service for a time." *United States v. Alzanki*, 54 F.3d 994, 1000 (1st Cir. 1995) (internal quotation marks omitted).

Here, defendants violated § 1589(a) by forcing plaintiff to work in UNOI businesses and homes without pay beginning at age 11. Defendants' intimidation tactics led plaintiff to believe

that serious harm would come to her if she left the "safety" of UNOI.  Defendants subjected

plaintiff to humiliating and degrading treatment and obstructed her communications with her

friends and family.  They subjected plaintiff to physical and emotional abuse and controlled her

living situations by forcibly moving her around the United States.  Defendants denied plaintiff

basic creature comforts, causing her to become severely malnourished.  And she never could

seek any health insurance or medical care outside of UNOI.  Similarly, defendants prohibited

plaintiff from receiving any education other than UNOI's education system after the age of 15.

This system expounded teachings that elevated black men above all others—men and women of

other races, alike.  Defendants controlled plaintiff's romantic relationships and even the language

she could use.  And defendants maintained a strict discipline system that imposed serious

punishment and public humiliation for even minor infractions.  Defendants exploited plaintiff's

vulnerability, knowing that she was unfamiliar with the world outside the cult, had received no

standard education, was constantly moved from place to place, and had no money.  Plaintiff's

allegations and testimony have demonstrated that defendants' actions were intended to cause her

to believe that if she did not continue to work for them, she would suffer serious harm.

Her allegations also have established a violation of § 1589(b).  Defendants are liable

under § 1589(b) because they knowingly benefited by receiving something of value—namely

plaintiff's forced labor for no compensation.  *See* 18 U.S.C. § 1589(b).  Defendants' knowledge

is established by the fact that they trafficked individuals, including plaintiff, who were not paid

any wages for the work they performed in businesses and homes owned by defendants.

Defendants also controlled plaintiff's purchases, confining her to specific groceries and other

items.  They forced her to surrender her EBT Card (food stamps from the federal government) to

UNOI leaders and confiscated plaintiff's food subsidy issued to her by the government.

24

For these reasons, plaintiff's allegations establish that defendant violated both subsections (a) and (b) of § 1589 of the TVPRA and so, the court grants plaintiff default judgment on her TVPRA forced labor claim under Count I.

### b.     Human Trafficking

Plaintiff's alleged facts and testimony also establish a trafficking claim under § 1590 of the TVPRA.  Section 1590 makes it unlawful knowingly to recruit, harbor, transport, provide, or obtain by any means, any person for labor or services under conditions which violate any peonage, slavery, and trafficking offenses in Chapter 77 of Title 18.

Here, defendants recruited plaintiff for UNOI membership.  Then, they harbored her in UNOI homes where they forced her to perform childcare, cooking, and cleaning services without pay for most of her childhood.  During that time, defendants transported plaintiff around the country against her will so she could supply forced labor.  The court concludes that defendants trafficked plaintiff for forced labor and thus grants plaintiff default judgment on her TVPRA human trafficking claim under Count II.  Defendants' TVPRA violations entitle plaintiff to compensatory damages for restitution and emotional distress, punitive damages, and attorneys' fees.

### 2.     Under State Human Trafficking Laws (Counts III, V, VII, and X)

The well-pleaded facts in plaintiff's Complaint also establish human trafficking violations under Kansas, New York, New Jersey, and Ohio laws.

In Kansas, Kan. Stat. Ann. § 60-5003 establishes a civil course of action for victims of human trafficking, as defined by Kan. Stat. Ann. § 21-5426.  The definition of human trafficking and aggravated human trafficking in Kan. Stat. Ann. § 21-5426 largely tracks the definition of the federal statute.  *Compare* Kan. Stat. Ann. § 21-5426 *with* 18 U.S.C. §§ 1589, 1590.  A survivor of human trafficking can use this state law civil remedy if she has suffered—as plaintiff

here has—personal or psychological injury because of the conduct.  *See* Kan. Stat. Ann. § 60-5003.

Here, the Complaint's facts—corroborated by the plaintiff's testimony—establish that defendants violated Kan. Stat. Ann. § 21-5426.  They intentionally recruited, harbored, and obtained plaintiff for labor and services while she was based in Kansas City, Kansas.  They used force, fraud, and coercion against plaintiff.

In New York, N.Y. Soc. Servs. Law § 483-bb(c) provides a civil action for victims of labor trafficking, as defined by N.Y. Penal Law § 135.35.  The definition of human trafficking in § 135.35 tracks the definition used by the federal statute.  *Compare* N.Y. Penal Law § 135.35 *with* 18 U.S.C. §§ 1589, 1590.  Trafficking survivors can utilize the New York state civil remedy against their "perpetrator or whoever knowingly advances or profits from, or whoever should have known he or she was advancing or profiting from" labor trafficking in violation of N.Y. Penal Law § 135.35.  *See* N.Y. Soc. Servs. Law § 483-bb(c).

Here, defendants violated N.Y. Soc. Servs. Law § 483-bb(c) by requiring plaintiff to perform labor to repay or service a real or purported debt that defendants caused by a systematic ongoing course of conduct with an intent to defraud plaintiff.  Defendants also violated N.Y. Soc. Servs. Law § 483-bb(c) by engaging in a scheme to compel plaintiff to engage in labor by instilling fear that if plaintiff did not comply, she would face physical injury and "hatred, contempt or ridicule."

In New Jersey, N.J. Stat. Ann. § 2C:13-8.1 provides a civil action for victims of human trafficking, as defined by N.J. Stat. Ann. § 2C:13-8(1)(a).  The definition of human trafficking in this provision follows the definition in the federal statute.  *Compare* N.J. Stat. Ann. § 2C:13-8 *with* 18 U.S.C. §§ 1589, 1590.  A human trafficking survivor can use the New Jersey civil

remedy against the traffickers and co-actors if she suffered personal or psychological injury because of the conduct.

Here, defendants violated N.J. Stat. Ann. § 2C:13-8.1 by enticing and transporting plaintiff to engage in labor by fraud, deceit, and misrepresentation, and by receiving something of value—plaintiff's labor—by participating in a scheme or course of conduct that comprised labor trafficking.

In Ohio, Ohio Rev. Code Ann. § 2307.51 creates a private right of action for victims of trafficking for "harm that resulted from the violation of section 2905.32 of the Revised Code." *See* Ohio Rev. Code Ann. § 2307.51(A).  Ohio Rev. Code § 2905.32, in turn, makes it unlawful to "knowingly recruit, lure, entice, harbor, transport, provide, obtain or maintain" or knowingly attempt any of those actions where "[t]he offender knows that the other person will be subjected to involuntary servitude[.]"  To establish a claim under Ohio Rev. Code Ann. § 2905.32(A)(1), "the element 'compelled' does not require that the compulsion be openly displayed or physically exerted.  The element 'compelled' has been established if the state proves that the victim's will was overcome by force, fear, duress, intimidation, or fraud."  *See* Ohio Rev. Code Ann. § 2905.32(B).

Here, plaintiff established a violation of Ohio Rev. Code Ann. § 2307.51.  In 2009, UNOI forcibly transported plaintiff from New Jersey to Ohio to work at a Jenkins family home and a UNOI restaurant.  UNOI then harbored plaintiff in Dayton, Ohio, first in a group home, then at a home owned by the Jenkins family, and finally with a UNOI couple.  During her time in Dayton, Ohio, plaintiff was forced into involuntary servitude, working in the UNOI restaurant and as a maid for UNOI, all without pay.  Defendants' violation of Ohio Rev. Code Ann. § 2905.32(A)(1) harmed plaintiff in the form of lost wages for work performed and emotional distress.

In sum, plaintiff has established violations of Kansas, New York, New Jersey, and Ohio human trafficking laws and so, the court grants her default judgment on these claims in Counts III, V, VII and X.  Defendants' violations of these state laws entitle plaintiff to recover compensatory and punitive damages as well as attorneys' fees.  *See* Kan. Stat. Ann. § 60-5003; N.Y. Soc. Servs. Law § 483-bb(c); N.J. Stat. Ann. § 2C:13-8.1; Ohio Rev. Code Ann. § 2905.32(B).

### 3.  Under the FLSA (Count XII)

Next, plaintiff has established an FLSA violation.  The FLSA requires employers to pay employees minimum wage.  *See* 29 U.S.C. § 206(a), (f) (establishing a minimum wage of $7.25 for employees engaged in commerce and domestic services).  The FLSA also provides that employees working more than 40 hours a week must receive overtime compensation in an amount one and one-half times the employee's regular rate.  *See* 29 U.S.C. § 207(a).  Employers are required to make, keep, and preserve specific employment-related records, including records of their employees and their wages, hours, and other conditions and practices of employment. *See* 29 U.S.C. § 211(c).

A plaintiff may establish the total hours worked under the FLSA by a reasonable estimate of hours worked and compensation received, particularly where the employer failed to maintain employee records.  *See Robinson v. Food Serv. of Belton, Inc.*, 415 F. Supp. 2d 1232, 1235 (D. Kan. 2005) ("[I]n FLSA cases where the employer's time records are inaccurate or incomplete, an employee's burden is met 'if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'") (quoting *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).

Here, defendants failed to pay plaintiff the required compensation for her work, in both the various bakeries and restaurants where she worked and also her domestic service work in UNOI residences.  This omission violated § 206(a) and (f) of the FLSA.  Also, defendants have violated § 207 of the FLSA by failing to pay plaintiff the applicable overtime wages for every compensable hour of labor worked in excess of 40 hours per week.  In addition to these failures, defendants also failed to keep employment records.

The Complaint alleges these failures with sufficient certainty.  Plaintiff's allegations also sufficiently establish the total hours she worked.  For these reasons, the court concludes that plaintiff has established that defendants violated the FLSA and grants her default judgment on this claim under Count XII.  Defendants' violation entitles plaintiff to recover liquidated damages.  *See* 29 U.S.C. § 216(b).  The FLSA also entitles a prevailing plaintiff to recover "a reasonable attorney's fee . . . and costs of the action."  *See, e.g.*, *Gray v. Phillips Petroleum Co.*, 971 F.2d 591, 593 (10th Cir. 1992) (quoting 29 U.S.C. § 216(b)).

### 4.     Under State Minimum Wage Laws (Counts IV, VI, IX, and XI)

Next, the facts alleged by plaintiff's Complaint establish minimum wage law violations under Kansas, New York, New Jersey, and Ohio laws.

In Kansas, Kan. Stat. Ann. § 44-1211(a) provides a private right of action for an employee against her employer if the employer failed to pay "less than the wages and overtime compensation to which such employee [was] entitled."  Kan. Stat. Ann. § 44-1211(a).  An agreement between the employee and the employer to work for less than the minimum wage is "no defense to [an] action."  *Id.*  Here, plaintiff has shown that defendants violated the Kansas Minimum Wage and Overtime Law.  Defendants never paid plaintiff for any of her work, including her overtime.  For these reasons, plaintiff has demonstrated that defendants violated Kansas's Minimum Wage and Overtime Law.

In New York, N.Y. Labor Code § 663(1) provides a private right of action for an employee against her employer if the employer paid her less than the wages she was entitled to receive.  Plaintiff has shown that she was defendants' employee—she worked in businesses owned and operated by defendants in New York for several months in 2009.  And, plaintiff has established, defendants didn't pay her for any of the hours she worked as a cook at their New York restaurant.  Thus, plaintiff has established a violation of N.Y. Labor Code § 663(1).

The New Jersey State Wage and Hour Law ("NJWHL"), N.J.S.A. 34:11-56 *et seq.*, provides a private right of action for an employee against her employer if the employer paid her less than the wages she was entitled to receive.  *See* N.J. Stat. Ann. §34.11-56a25.  Plaintiff has shown that she was an employee of defendants in New Jersey for several months in 2009.  Plaintiff also has shown that she was not paid for any of her work she performed as a maid and house cook in UNOI homes there.  For these reasons, plaintiff has demonstrated a violation of N.J. Stat. Ann. § 34.11-56a25.

The Ohio Minimum Fair Wage Standards Act ("OMFWSA") "requires all employers to pay a minimum wage and overtime to certain types of employees."  *See* Ohio Const. Art. II, Sec. 34a (establishing minimum wage); *see also* Ohio Rev. Code Ann. §§ 4111.02 (duty to pay minimum wage); 4111.03 (duty to pay overtime).  The overtime standard in Ohio requires employers to pay overtime "at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek."  Ohio Rev. Code Ann. § 4111.03(A).  An agreement between the employee and the employer to work for less than the overtime wage "is no defense."  *See id.*

Here, plaintiff has established a violation of Ohio state labor laws.  Plaintiff worked at a UNOI restaurant in Ohio, and as a maid in the Jenkins household there, generally working six

days a week beginning at 6:00 a.m. and ending as late as 11:00 p.m.  Defendants did not provide

plaintiff any compensation for the services plaintiff performed while living in Ohio.  For these

reasons, plaintiff has established violations of OMFWSA and the Ohio Constitution, Article II,

Section 34a.

In sum, plaintiff has established that defendants violated Kansas, New York, New Jersey,

and Ohio minimum wage laws and so, the court grants plaintiff default judgment on her claims

for these violations under Counts IV, VI, IX, and XI.

Defendants' violation of each state's minimum wage law entitles plaintiff to recover

damages and attorneys' fees.  *See* Kan. Stat. Ann. § 44-1211(a); N.Y. Lab. Law § 663(1); N.J.

Stat. Ann. §34.11-56a25; Ohio Const. Art. II, Sec. 34a; Ohio Rev. Code Ann. § 4111.10(A).

### 5.      Under RICO (Count XIII)

Plaintiff's factual allegations also establish liability and damages under the RICO Act.

"Any person injured in his business or property by [a RICO activity] may sue therefor in any

appropriate United States district court and shall recover threefold the damages he sustains and

the cost of the suit, including a reasonable attorney's fee."  18 U.S.C. § 1964.  The elements of a

civil RICO claim are: "(1) investment in, control of, or conduct of (2) an enterprise (3) through a

pattern (4) of racketeering activity." *Tal v. Hogan*, 453 F.3d 1244, 1261–62 (10th Cir. 2006)

(citing 18 U.S.C. § 1962(a), (b), & (c)).

> Racketeering activity is defined in 18 U.S.C. § 1961(1)(B) as any act which is
> indictable under federal law and specifically includes mail fraud, wire fraud and
> racketeering.  These underlying acts are referred to as predicate acts, because they
> form the basis for liability under RICO.  [A] person does not have to be formally
> convicted of any predicate act before liability under 18 U.S.C. § 1962[ ] may attach.

*Id.* (internal quotations and citations omitted); *Magnifico v. Villanueva*, 783 F. Supp. 2d 1217,

1229 (S.D. Fla. 2011) (identifying human trafficking and forced labor as predicate acts under

RICO); *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1148 (C.D. Cal. 2011) ("Plaintiffs have stated valid claims for forced labor [and] human trafficking . . . and these claims may also serve as underlying predicate acts for Plaintiffs' RICO claim.").

Here, defendants trafficked plaintiff from the age of 11 through age 21 and forced her to perform labor and services without compensation.  Plaintiff thus has standing to sue under 18 U.S.C. § 1964(c).  Also, defendants continuously conducted an ongoing enterprise engaged in the pattern and practice of human trafficking and forced labor, violations of 18 U.S.C. §§ 1589, 1590 and 1595.  Defendants repeatedly committed RICO predicate acts constituting a pattern of racketeering activity by engaging in human trafficking and forced labor since at least 1978.  *See id.*  In the commission of this racketeering activity, defendants regularly moved goods and people across state lines, engaging in interstate commerce.  *See id.*  Plaintiff has established the required elements for a RICO violation, and so the court thus grants plaintiff's request for a default judgment on her RICO claim in Count XIII.  Defendants' RICO violation entitles plaintiff to recover trebled damages and attorneys' fees.

### 6.    Kansas State Law Claims

Finally, plaintiff's allegations establish defendants' violations of Kansas state law for conversion, unjust enrichment, and intentional infliction of emotional distress.

### a.    Liability for Conversion (Count XIV)

"Conversion is the unauthorized assumption or exercise of a right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights."  *Indep. Drug Wholesalers Grp., Inc. v. Denton*, No. 92-2164-JWL, 1993 WL 191393, at *6 (D. Kan. May 13, 1993) (internal quotations and citation omitted).  Here, defendants converted plaintiff's government-issued food stamps and subsidies by improperly exercising a right of ownership over

them.  Plaintiff did not authorize this exercise of rights over government-issued subsidies she properly owned.  Defendants' wrongful exercise of ownership over plaintiff's subsidies prohibited her from exercising her own rights over them.  Plaintiff has established the required elements for conversion.  The court thus enters default judgment on Count XIV for conversion. This conclusion entitles plaintiff to damages.

### b.    Liability for Unjust Enrichment (Count XV)

Plaintiff also has alleged facts establishing an unjust enrichment claim.  An unjust enrichment claim consists of three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value."  *Regal Ware, Inc. v. Vita Craft Corp.*, 653 F. Supp. 2d 1146, 1151 (D. Kan. 2006).

Here, plaintiff conferred a benefit on defendants by working in bakeries, factories, and UNOI homes, where she cooked, cleaned, and cared for children without any compensation. Defendants were aware of the benefits conferred by plaintiff's labor and services.  Defendants' awareness is established by their widespread and continuous employment of trafficked laborers, including plaintiff, who are not paid any compensation for work performed in businesses and homes owned by them.  Defendants retained the benefit of all of plaintiff's various labor services without compensating her.  Plaintiff has established the required substantive elements for unjust enrichment.  The court enters default judgment on plaintiff's claim for unjust enrichment in Count XV.  Plaintiff thus is entitled to recover damages for defendants' unjust enrichment.

       **c.**     **Liability for Intentional and Negligent Infliction of Emotional Distress (Counts XVI and XVII)**

Finally, plaintiff has alleged facts establishing intentional infliction of emotional distress. "In Kansas, the tort of outrage is the same as the tort of intentional infliction of emotional distress." *Valadez v. Emmis Commc'ns*, 229 P.3d 389, 394 (Kan. 2010). To prevail on "a claim for intentional infliction of emotional distress, a plaintiff must prove four elements:" (1) the defendants' conduct "was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous;" (3) "a causal connection between the defendant[]s['] conduct and the plaintiff's mental distress;" and (4) "the plaintiff's mental distress was extreme and severe." *Id.* "It is only where the distress is 'extreme' or 'severe' that liability arises." *Id.* at 395.

In *Valadez*, the Kansas Supreme Court held:

> Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it.

*Id.* at 394.

*First*, defendants' conduct here unmistakably was intentional—or, at least—in reckless disregard of plaintiff's status as a free citizen of the United States. Defendants directed a regimented cult that forced plaintiff into forced labor through systemic and continued intimidation and psychological abuse. They deliberately developed doctrinal and disciplinary programs to facilitate human trafficking. And, they forced individuals—plaintiff included—to work without any pay, breaks, or benefits. Specifically, defendants forced plaintiff to work without pay or other compensation beginning at the age of nine. They also removed her from public school at age 11 and forced her to attend a UNOI-run school from which they later removed her. After the age of 15, defendants refused to permit plaintiff to attend any school.

Defendants separated plaintiff from her mother and forced her to live in a women's household at the age of 12.  They only fed her rice, beans, fruit, and salad, causing her to become malnourished.  And defendants prohibited her from seeing a licensed doctor or seeking medical attention for her malnourishment.

Defendants frequently and forcibly moved plaintiff across the country.  Defendants transferred plaintiff from one city to another in the back of a commercial delivery truck.  Throughout her entire servitude with defendants, plaintiff was subjected to verbal and physical abuse, and express and implied threats of force and harm.  She was intentionally isolated from her family, and was forced into an arranged marriage with a polygamy practicing member of UNOI.  Defendants' conduct toward plaintiff was intentional.

*Second*, defendants' conduct was extreme and outrageous.  *See Roberts v. Saylor*, 637 P.2d 1175, 1179 (Kan. 1981) ("[T]he defendant[]s['] conduct must be found to be so extreme and outrageous as to permit recovery.").  Defendants' conduct was more than "criticism, rough language, and occasional acts and words that are inconsiderate and unkind[]" and "goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Taiwo v. Vu*, 822 P.2d 1024, 1029 (Kan. 1991).

*Third*, there is a causal connection between defendants' conduct and plaintiff's mental distress.  Plaintiff suffers from long lasting psychological pain and has been diagnosed with post-traumatic stress disorder as a direct result from defendants' conduct.  Her licensed clinical social worker testified that plaintiff would not have suffered from such pain and distress but for such conduct.

*Fourth*, plaintiff's mental distress was extreme and severe.  *See Taiwo*, 822 P.2d at 1029 ("[P]laintiff's mental distress must be extreme and severe."); Restatement (Second) of Torts §

46, comment. j (1976) ("Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant[]s['] conduct is in itself important evidence that the distress has existed."). Her emotional distress "is so severe that no reasonable person should be expected to endure it." *Roberts*, 637 P.2d at 1179. In sum, defendants stole plaintiff's childhood and left her underdeveloped to find her own way once she became an adult. Further, plaintiff's pain and distress is long lasting. She has undergone medical treatment and psychological counseling and has been diagnosed with post-traumatic stress disorder. To this day, defendants' actions continue to affect her ability to lead a fulfilling life.

For these reasons, plaintiff alleges facts establishing a claim of intentional infliction of emotional distress. The court grants default judgment on this claim. Plaintiff is entitled to recover damages for her emotional distress under Count XVI. [4]

### D.    Damages

Defendants' various violations—as described above—entitle plaintiff to recover a variety of damages. The following six subsections evaluate and decide plaintiff's requests for damages.

### 1.    Compensatory Damages for Restitution

Defendants' violations entitle plaintiff to recover restitution damages under multiple theories, *i.e.*, the TVPRA, state human trafficking laws, state minimum wage laws, and for unjust enrichment. But permitting plaintiff to recover the same bundle of damages more than once under various overlapping legal theories would permit multiple recoveries. This, of course, is impermissible. *See Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997), *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011) ("If a federal claim and a state claim arise from the same operative facts, and seek

---

[4]    Because plaintiff establishes intentional infliction of emotional distress, the court does not address her negligent infliction of emotional distress claim.

identical relief, an award of damages under both theories will constitute double recovery.").  The court concludes that these theories of recovery all arise from the same operative facts and so, plaintiff may recover this bundle of damages just once.

### a.     TVPRA Restitution

Plaintiff has established that she is entitled to recover restitution damages under the TVPRA at the prevailing wage rate.  A victim of human trafficking and forced labor may recover damages under 18 U.S.C. § 1595(a).  In addition to this civil remedy, § 1593 authorizes mandatory restitution for human trafficking victims.  *Id.* § 1593(a).  Under § 1593, victims are guaranteed compensation for the value of their services at the minimum wage under the FLSA.  But plaintiff argues that nothing in § 1595 limits her civil recovery to minimum wage.  Indeed, the Tenth Circuit has condoned compensation in trafficking cases based on the prevailing wage rate.  *See Francisco v. Susano*, 525 F. App'x 828, 835 (10th Cir. 2013) ("[T]here is nothing inappropriate in requiring those who have engaged in or benefited from forced labor to rectify the wrong by compensating the victim at the prevailing wage rate for the work done.").  The Circuit reasoned:  "Limiting [TVPRA] victims to the FLSA remedy would *inappropriately* afford criminals engaged in such egregious practices the benefit of the lowest common-denominator minimum wage set for legitimate employers."  *Id.* (emphasis in original).  Here, plaintiff has established the prevailing wage rate for the locations of her forced labor at the time she performed the services.  Doc. 24-2 at 12–47 (citing U.S. Department of Labor statistics that show the prevailing wage rate at the locations she worked).

There is no reason to deny plaintiff compensation for the services she provided at the same rates received by others who voluntarily provided those same services.  The court thus concludes that plaintiff is entitled to recover compensatory damages for restitution at the

prevailing wage rate. Based on the prevailing wage rate for each service in each location and the number of hours plaintiff performed those services, the court finds that plaintiff is entitled to recover $453,517.20 in restitution damages under Count I and II's claims under the TVPRA.

### b.    State Law Restitution

Plaintiff also is entitled to recover restitution damages under Kansas, New York, New Jersey, and Ohio human trafficking laws. *See* Kan. Stat. Ann. § 60-5003; N.Y. Soc. Servs. Law § 483-bb(c); N.J. Stat. Ann. § 2C:13-8.1; Ohio Rev. Code Ann. § 2905.32(B). The court was unable to locate any case authority applying the Kansas, New York, and Ohio statutes to determine whether those laws permit plaintiff to recover restitution damages at the prevailing wage rate or, instead, at the minimum wage rate. New Jersey, in contrast, explicitly authorizes use of the prevailing wage rate. *See* N.J. Stat. Ann. § 2C:13-8.1(c)(2) (authorizing the calculation of "the value of the injured party's labor or services as determined by the 'New Jersey Prevailing Wage Act'"). Nothing suggests the other three states intended to limit plaintiff's recovery to the minimum wage rate. To the contrary, the rationale expressed in *Francisco* favors awards at the prevailing rate. The court thus concludes plaintiff is entitled to recover restitution damages at the prevailing wage rate under all four states' statutes. Plaintiff asserts—for the jobs she performed in the various state where she performed them—that she is entitled to recover $220,568.40 under Kansas law (Count III), $14,579.50 under New York law (Count V), $14,220.18 under New Jersey law (Count VII), and $183,055.08 under Ohio law (Count X). *See* Doc. 24-1 at 1. The court agrees and awards her these amounts in restitution damages under these state laws.

Defendants' violations of Kansas, New York, New Jersey, and Ohio minimum wage laws also entitle plaintiff to recover damages. *See* Kan. Stat. Ann. § 44-1211(a); N.Y. Lab. Law §

663(1); N.J. Stat. Ann. §34.11-56a25; Ohio Const. Art. II, Sec. 34a; Ohio Rev. Code Ann. § 4111.10(A).  Plaintiff is entitled to recover $57,600.40 in damages for work she performed in Kansas (Count IV), $7,064.20 for work performed in New York (Count VI), $7,064.20 for work performed in New Jersey (Count IX), and $99,645 for work performed in Ohio (Count XI).  And so, the court awards her these amounts on these claims.

Finally, plaintiff's services in defendants' Kansas-based factories, bakeries, and homes unjustly enriched defendants (Count XV).  The court already has determined the value of plaintiff's services in Kansas was $220,568.40.  The court thus awards plaintiff this amount as compensation on Count XV's unjust enrichment claim.

While plaintiff undoubtedly deserves to recover restitution damages under a variety of legal theories, she cannot recover multiple times for the same services.  Think of it this way: Plaintiff deserves to recover restitution damages of $453,517.20 under the TVPRA.  This award is derived from defendants having forced plaintiff to perform various services for a decade between age 11 and age 21.  The TVPRA claim produced an award of $453,517.20.  But it is equally true that other sources of law entitle plaintiff to recover restitution for smaller increments of time falling within the same ten years covered by her TVPRA claim.  While varied legal theories entitle plaintiff to recover these damages, plaintiff cannot recover multiple times for providing the same services.  *See, e.g.*, *Mason*, 115 F.3d at 1459 ("If a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery.").

The TVPRA covers the entire span of compensable restitution, and it thus produces the greatest recovery for plaintiff.  The court already has decided that plaintiff may recover a total of **$453,517.20** for restitution damages on Counts I and II.  She may recover the other incremental

awards of restitution damages on her state law trafficking claims (Counts III, V, VII, and X), minimum wage law claims (Counts IV, VI, IX, and XI) and unjust enrichment claim (Count XV) only if some later proceeding would nullify the court's award of restitution damages under the TVPRA.

### 2. Compensatory Damages for Emotional Distress

Plaintiff also has established that she is entitled to recover compensatory damages for emotional distress that defendants inflicted on her under multiple theories. Like plaintiff's theories to recover restitution damages, these theories of recovery for emotional distress damages, all arise from the same operative facts and so, plaintiff may recover this bundle of damages just once. *See Mason*, 115 F.3d at 1459 ("If a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery.").

### a. TVPRA Emotional Distress Damages

The TVPRA permits trafficking victims to recover compensatory damages for emotional distress. *See Doe v. Howard*, No. 1:11-CV-1105, 2012 WL 3834867, at *2 (E.D. Va. Sept. 4, 2012) (citing *Shukla v. Sharma*, No. 07-CV-2972 CBA CLP, 2012 WL 481796, at *14 (E.D.N.Y. Feb. 14, 2012)). Courts have reasoned that an additional award of emotional distress damages is necessary to "redress noneconomic harm, particularly suffering related to the squalid, restricted, and threatening working/living conditions imposed on [TVPRA] victims." *Francisco*, 525 F. App'x at 835.

When determining such damages, courts look to "all relevant circumstances . . . including sex, age, condition in life and any other fact indicating susceptibility of the injured person to [the] type of harm." *Mazengo v. Mzengi*, No. 07-756 RMC AK, 2007 WL 8026882, at *7

(D.D.C. Dec. 20, 2007) (citation omitted); *see also Doe*, 2012 WL 3834867, at *4 (considering false promises regarding salary, health insurance, vacation time, and a safe environment to work when calculating forced labor damages).  A victim may recover multiple emotional distress awards for different TVPRA violations.  *See Shukla*, 2012 WL 481796, at *14 (awarding separate damages for forced labor and trafficking, separating damages from services and transporting).

Courts have awarded damages for emotional distress to trafficking victims subjected to forced labor in amounts ranging from $415 to $780 per day.  *See, e.g.*, *Gurung v. Malhotra*, 851 F. Supp. 2d 583 (S.D.N.Y. 2012) (awarding $415 per day to a victim forced to work 16 hours per day, seven days a week, for 40 months as a maid); *Shukla*, 2012 WL 481796, at *8–9 (awarding $780 a day to a victim forced to work 17 hours per day for three and a half years); *Doe*, 2012 WL 38348767, at *3–4 (awarding $500 a day to a victim forced to work 80–90 hours per week and confined in defendants' home for three months).

Here, defendants' conduct caused plaintiff to fear them and the reprisals they would take against her if she left.  They yelled at her, and generally humiliated, shamed, and embarrassed her on a regular basis.  Defendants subjected plaintiff to grueling work days without days off.  Plaintiff was subjected to this treatment from the time she was 11 to age 21.  She was young, vulnerable, and alone during this 10-year period.  Plaintiff continues to suffer the effects of her emotional distress today.

Plaintiff asks the court to award her $800 per day for the emotional distress she suffered.  This amount exceeds the emotional distress rate used in *Shukla*, but just barely.  This increase is a minor one and the facts here establish that plaintiff deserves $800 per day.  Two factors stand out to the court—the length of the emotional distress and plaintiff's age.  Plaintiff is claiming

emotional distress sustained, unabated, for 10 years. Defendants subjected plaintiff to emotional distress for twice as long as the victim in *Shukla*. Moreover, the victim in *Shukla* was an adult man, while plaintiff was an adolescent girl during the vast majority of her mistreatment. The court concludes plaintiff is entitled to recover emotional distress damages equal to $800 per day. Plaintiff was subjected to this distress for 10 years (3,650 days). So, the court awards plaintiff $2,920,000 for emotional distress damages under the TVPRA under Counts I and II.

**b.     State Law Emotional Distress Damages**

Plaintiff also asks the court to award emotional distress damages under Kansas, New York, New Jersey, and Ohio human trafficking laws. The court already has determined plaintiff is entitled to recover emotional distress damages equal to $800 per day. Concluding that this rate applies also to her state law emotional distress claims, the court finds that plaintiff deserves $1,200,000 under Kansas law (Count III), $65,000 under New York law (Count V), $65,000 under New Jersey law (Count VII), and $815,000 under Ohio law (Count X). The court awards her these amounts in emotional distress damages under these states' human trafficking laws.

Finally, plaintiff is entitled to recover emotional distress damages under Count XVI, her claim for defendants' intentional infliction of emotional distress under Kansas law. The court's previous calculations establish that plaintiff is entitled to recover $1,200,000 for this tortious conduct. And so the court awards her this amount for defendants' intentional infliction of emotional distress.

As with her restitution damages, plaintiff is entitled to recover emotional distress damages under the various anti-trafficking laws and Kansas tort law, but she may recover these damages just once. *See Mason*, 115 F.3d at 1459 ("If a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will

42

constitute double recovery.").  Plaintiff deserves to recover emotional distress damages of $2,920,000 under the TVPRA.  Again, these damages are derived from the 10 years that defendants inflicted emotional distress on her.  And the damage amounts under other theories cover smaller periods of time within those 10 years.  Since an award under the TVPRA produces the greatest recovery to plaintiff, the court concludes that plaintiff may recover **$2,920,000** for emotional distress damages under Counts I and II.  She may recover the other emotional distress awards recognized in this subsection—state human trafficking laws (Counts III, V, VII, and X) and intentional infliction of emotional distress (Count XVI)—only if some later proceeding would nullify the court's award under the TVPRA.

### 3.  Punitive Damages

Also, plaintiff has persuaded the court that she is entitled to recover punitive damages. Like the previous two damages subsections, plaintiff deserves to recover punitive damages under the TVPRA and state human trafficking laws.

Punitive damages are generally available for federal claims where defendant acts with "evil motive or intent," or with "reckless or callous indifference" to federally protected rights. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).  The punitive damages inquiry focuses on the character of the tortfeasor's conduct.  That is, whether it was of the sort that calls for deterrence and punishment over and above that provided by compensatory awards.  *See F.D.I.C. v. Hamilton*, 122 F.3d 854, 860 (10th Cir. 1997).

"Punitive damages are generally appropriate under the [TVPRA] civil remedy provision because [the TVPRA] creates a cause of action for tortious conduct that is ordinarily intentional and outrageous."  *Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011).  In other words, because "the wrong done by [a] violation of the [TVPRA]" is one that involves "significant

violations not only of labor standards but fundamental health and personal rights as well," an award of punitive damages in a TVPRA case is generally consistent with "the traditional use of punitive damages . . . to punish and deter conduct involving an element of outrage." *Francisco*, 525 F. App'x at 834–35.  Significant punitive damages are warranted, notwithstanding the inclusion of FLSA liquidated damages in TVPRA compensatory damages awards, because the FLSA "simply remedies the failure to pay wages at the statutory minimum [w]age." *Id.* at 835. By contrast, "[t]he forced labor addressed by the TVPRA is a categorically different wrong, involving work extracted from victims by the illegal and coercive means specified in the statute." *Id.*

Indeed, courts have recognized that trafficking is a particularly depraved act and so, they have awarded significant punitive damages for TVPRA violations.  *See Doe*, 2012 WL 3834867, at *4–5 (awarding punitive damages of $2 million under the TVPRA for forced labor, forced sexual servitude, and trafficking); *Gurung*, 851 F. Supp. 2d 583, 595 (S.D.N.Y. 2012) (awarding $300,000 in punitive damages for a victim forced to work as a maid for 16 hours per day, seven days a week for forty months).

Here, with reckless disregard for plaintiff's health and safety, defendants intentionally and maliciously trafficked and forced her to work in their residences and businesses for excessive hours—all with no pay or other benefits.  Defendants flagrantly violated the laws of the United States, and trafficked other men, women, and children as well.  The court thus concludes that punitive damages are necessary to punish defendants and deter them and others from trafficking their fellow human beings.

Plaintiff requests $5,000,000 in punitive damages.  The Supreme Court has identified three factors that guide a punitive damages award:  "(1) the degree of reprehensibility of the

tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Shukla*, 2012 WL 481796, at *15 (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

The first and third factors tend to be equal for TVPRA violators, so the second factor— the ratio of punitive damages to compensatory damages—has become the focus for punitive damages award in TVPRA cases.  There is an increasing trend to award punitive damages equal to the total compensatory damages award.  *See Lipenga v. Kambalame*, 219 F. Supp. 3d 517, 532 (D. Md. 2016) (awarding equal compensatory and punitive damages); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 458 (E.D. Va. 2015) (same); *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 27 (D.D.C. 2013) (same); *Shukla*, 2012 WL 481796, at *16 (reducing a jury's punitive damage award to an amount equal to the compensatory damages award); *Canal v. Dann*, No. 09–03366 CW, 2010 WL 3491136, at *4 (N.D. Cal. Sept. 2, 2010) (awarding equal compensatory and punitive damages).

Here, the court has awarded plaintiff $3,373,517.20 in compensatory damages.  The court concludes punitive damages in an equal amount are appropriate.  The court thus awards plaintiff $3,373,517.20 in punitive damages under Count I and II's claims under the TVPRA.

Plaintiff also seeks an award of punitive damages under Kansas, New York, New Jersey, and Ohio human trafficking laws.  Similar to its award under the TVPRA, the court awards plaintiff punitive damages equal to the compensatory damages award under each state law.  Applying this concept, the court makes the following punitive damages awards:  $1,420,568.40 under Kansas law (Count III); $79,579.50 under New York law (Count V); $79,220.18 under New Jersey law (Count VII); and $998,055.08 under Ohio Law (Count X).

But the court uses the same logic it followed for restitution and emotional distress damages.  Because plaintiff may not recover multiple punitive damages awards for the same body of reprehensible conduct, *see Mason*, 115 F.3d at 1459, and because the TVPRA produces the greatest recovery to plaintiff, the court finds that plaintiff may recover **$3,373,517.20** in punitive damages under that act.  If any subsequent proceeding should nullify this award of punitive damages under the TVPRA, the court may need to reexamine whether the other punitive damages awards are sufficient to serve the purposes of punitive damages.

### 4.     Liquidated Damages

Plaintiff also deserves to recover liquidated damages under the FLSA.  Employers who violate FLSA §§ 206 and 207 are liable to employees for liquidated damages in an amount equaling the unpaid minimum wages and unpaid overtime compensation.  *See* 29 U.S.C. § 216(b).  Plaintiff's unpaid minimum wages equal $282,677.50.  *See* Doc. 24-1.  She is entitled to recover this amount as liquidated damages under Count XII's claim under the FLSA, and the court awards it to her.  But, the court already has awarded plaintiff restitution damages equal to the market value of her work.  So if she recovered liquidated damages for unpaid minimum wages it would duplicate the restitution award.  As a result, plaintiff may not recover unpaid minimum wages as liquidated damages.

In addition to unpaid minimum wages, courts have awarded trafficking victims unpaid overtime compensation equal to the amount of unpaid minimum wages.  *See Sabhnani*, 599 F.3d at 254–55 (finding the district court calculated unpaid minimum wages and then doubled it to compensate the victims for both minimum wages and overtime compensation).  Although plaintiff cannot recover unpaid minimum wages a second time, she deserves to recover overtime compensation under the FLSA in addition to the court's restitution award for unpaid wages.  The

court has calculated plaintiff's unpaid minimum wages as $282,677.50 and she is entitled to recover this same amount for unpaid overtime compensation.  *See id.*  The court thus awards plaintiff **$282,677.50** as liquidated damages on Count XII's claim for unpaid overtime compensation under the FLSA.

### 5.    Trebled RICO Damages

Also, plaintiff asks for an award of treble damages under Count XIII's RICO claim. "RICO provides a private civil action to recover treble damages for injury sustained by reason of a violation of its substantive provisions."  *Burdett v. Harrah's Kan. Casino Corp.*, 260 F. Supp. 2d 1109, 1120 (D. Kan. 2003); *see Smith v. Heim*, No. 85-1970-K, 1986 WL 15397, at *2 (D. Kan. Apr. 15, 1986) ("Congress created a private cause of action with treble damages and award of attorney fees to any prevailing plaintiff 'injured in [her] business or property by reason of a violation of Section 1962 of this chapter.'" (quoting 18 U.S.C. § 1964)).

Here, plaintiff has established that she sustained an injury because of defendants' violation of the substantive provisions of the RICO Act.  The court has awarded plaintiff $453,517.20 in restitution damages.  Trebling that amount results in $1,360,551.60 and the court awards plaintiff this trebled amount under RICO.  But because she cannot recover restitution damages more than once, plaintiff only may recover two-thirds of the trebled amount. Accounting for the $453,517.20 already awarded as restitution damages, the court awards plaintiff **$907,034.40** for the non-duplicative, trebled value of her restitution damages under the RICO Act.

### 6.    Conversion Damages

Finally, plaintiff asserts she is entitled to damages for conversion of her food stamp benefits and subsidies (Count XIV).  She alleges that defendants converted her food stamp

benefits and subsidies in the amount of $150 per month for at least one year, totaling at least $1,800.  The court thus finds that plaintiff is entitled to recover conversion damages in the amount of **$1,800**.

### E.    Attorneys' Fees

Last, plaintiff asks the court to award her attorneys' fees.  Our local rules require, "A party who moves for statutory attorney's fees pursuant to Fed. R. Civ. P. 54(d)(2) must promptly initiate consultation with the other party or parties."  D. Kan. Rule 54.2(a).  When the parties are unable to agree on a fee award, "the moving party must file the following within 30 days of filing the motion:  (1) a statement that, after consultation in accordance with this rule, the parties have been unable to reach an agreement with regard to the fee award; and (2) a memorandum setting forth the factual basis for each criterion that the court is asked to consider in making an award."  D. Kan. Rule 54.2(c).  This court previously has excused a plaintiff from the meet and confer requirement when the defendant had defaulted and failed to appear in the lawsuit. *Townley v. Servicemaster Co., LLC*, No. 17-2430-DDC-JPO, 2017 WL 5517948, at *1 (D. Kan. Nov. 17, 2017).

Here, defendant Royall Jenkins has filed a pro se "Motion for Writ of Certiorari."  Since he filed that motion, the Clerk has attempted to mail a notice of a hearing to Mr. Jenkins at the address he supplied to the court.  But that notice was returned by the United States Postal Service and marked, "unable to forward." *See* Doc. 27.  And, none of the defendant business organizations has appeared.  For these reasons, the court concludes it would be futile to require plaintiff to engage in the meet and confer process adopted by our local rule.  She is excused from this requirement.

Plaintiff asks the court to award her attorneys' fees and costs of $216,080.84. As already noted, the TVPRA, FLSA, RICO, and the Kansas, New Jersey, New York, and Ohio human trafficking and minimum wage state law claims entitle the prevailing party to recover attorneys' fees. For purposes of attorneys' fees, plaintiff is considered a prevailing party if she succeeded on "any significant issue in litigation which achieves some of the benefit [she] sought in bringing suit." *Gambrell v. Weber Carpet, Inc.*, No. CIV.A. 10-2131-KHV, 2012 WL 162403, at *2 (D. Kan. Jan. 19, 2012). Plaintiff is a prevailing party because the court is entering a default judgment on her TVPRA, FLSA, RICO, and Kansas, New Jersey, New York, and Ohio human trafficking and minimum wage state law claims. This entitles her to recover reasonable attorneys' fees.

Here, plaintiff's counsel is representing her on a pro bono basis. Our circuit has allowed recovery of attorneys' fees and costs when plaintiff was represented on a pro bono basis or by a publicly-funded legal aid clinic. *See Martinez v. Roscoe*, 100 F.3d 121, 124 (10th Cir. 1996) (upholding award of attorneys' fees when a publicly-funded legal aid program provided services); *see also Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989) ("[W]here there are lawyers or organizations that will take a plaintiff's case without compensation, that fact does not bar the award of a reasonable fee."); *Heng Chan v. Sung Yue Tung Corp.*, No. 03 CIV. 6048 (GEL), 2007 WL 1373118, at *2 (S.D.N.Y. May 8, 2007) (awarding attorneys' fees under 29 U.S.C. § 216(b) to a law firm handling the case pro bono); *Lainez v. Baltazar*, No. 5:11-CV-00167-BR, 2013 WL 3288369, at *2 (E.D.N.C. June 28, 2013) (awarding attorneys' fees under 18 U.S.C. § 1595(a) to Legal Aid of North Carolina).

The court now must determine if plaintiff's fee request is reasonable. The Tenth Circuit has instructed that "[t]he most useful starting point for determining the amount of a reasonable

fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Flitton*, 614 F.3d at 1176 (first citing *Hensley*, 461 U.S. at 433; then quoting *Robinson*, 160 F.3d at 1281 ("[A] court must begin by calculating the so-called 'lodestar amount' of a fee, . . . [which] is the product of the number of attorney hours 'reasonably expended' and a 'reasonable hourly rate.'")). The party requesting attorneys' fees bears the burden to prove the number of hours spent on the case and the appropriate hourly rates. *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1233 (10th Cir. 2000). Once an applicant satisfies this burden, the court presumes that the lodestar figure is a reasonable fee. *Robinson*, 160 F.3d at 1281.

After determining the lodestar amount, the court may adjust that figure upward or downward "'to account for the particularities of the suit and its outcome.'" *Fox v. Pittsburg State Univ.*, 258 F. Supp. 3d 1243, 1254 (D. Kan. 2017) (quoting *Zinna v. Congrove*, 680 F.3d 1236, 1242 (10th Cir. 2012)). This approach requires consideration of the factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989). Those factors are: (1) time and labor required; (2) novelty and difficulty of the questions presented in the case; (3) skill requisite to perform the legal service properly; (4) preclusion of other employment by the attorneys due to acceptance of the case; (5) customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or circumstances; (8) amount involved and results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–19.

Although the court may consider each factor, it need not consider those factors "'subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate.'" *Fox*, 258 F. Supp. 3d at 1254 (quoting *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F. Supp. 3d 1269, 1281 (D. Kan. 2016)).  This is so because "[t]he lodestar calculation is meant to be the primary consideration when awarding fees rather than the *Johnson* factors."  *Id.* (citing *Anchondo v. Anderson, Crenshaw & Assocs., LLC*, 616 F.3d 1098, 1103 (10th Cir. 2010)).

To support her fee request here, plaintiff has submitted her counsel's billing records. Doc. 34-1.  But plaintiff's counsel did not provide information about their experience, reputation, or ability.  By conducting its own research, the court has determined the approximate experience of most of the attorneys who worked on this case.[5]  The court has consolidated the attorneys' experience level, their hourly rate, and the hours they billed in this litigation in the table below.

| Attorney | Experience | Hourly Rate 2017 | Hours Billed 2017 | Hourly Rate 2018 | Hours Billed 2018 | Total Fee |
|---|---|---|---|---|---|---|
| Jonathan Blank | 22 years | $830.00 | 6.6 | $865.00 | 9.7 | $13,868.50 |
| Cristin Traylor | 17 years | $745.00 | 17.8 | $745.00 | 6.7 | $18,252.50 |
| Meghan Cloud | 13 years | N/A | N/A | $590.00 | 7.3 | $4,307.00 |
| Phillip Chang | 10 years | $675.00 | 5.6 | $695.00 | 6.9 | $8,575.50 |
| Gillian Chadwick | 8 years | $200.00 | 14.9 | $200.00 | 8.8 | $4,740.00 |
| Lauren Mahaffey | 5 years | $495.00 | 14.7 | $525.00 | 14.1 | $14,679.00 |
| Christopher McEachran | 5 years | $495.00 | 41.9 | N/A | N/A | $20,740.50 |

---

[5]    The court reviewed McGuireWoods LLP's webpage (http://www.mcquirewoods.com).  And, using the "Professionals" tab, the court searched for each attorney.

| Attorney | Experience | Hourly Rate 2017 | Hours Billed 2017 | Hourly Rate 2018 | Hours Billed 2018 | Total Fee |
|---|---|---|---|---|---|---|
| Katlyn Farrell | 5 years | $395.00 | 24.8 | $440.00 | 5.8 | $12,348.00 |
| Elizabeth Hutson | 4 years | $430.00 | 133 | $495.00 | 55.2 | $84,514.00 |
| Kayla Marshall | 3 years | $385.00 | 12.2 | $475.00 | 3.1 | $6,169.50 |
| Brian Wanglin | < 3 years[6] | N/A | N/A | $405.00 | 13.2 | $5,346.00 |
| Totals | | | 271.5 | | 130.8 | $193,540.50 |

Plaintiff's request also includes work conducted by paralegals and legal assistants. That work is consolidated in the following table.

| Paralegal/Legal Assistant | Hourly Rate 2017 | Hours Billed 2017 | Hourly Rate 2018 | Hours Billed 2018 | Total Fee |
|---|---|---|---|---|---|
| Chelsea Mason | N/A | N/A | $250.00 | 1 | $250.00 |
| Bonnie Powell | $295.00 | 36.6 | $295.00 | 2.9 | $11,652.50 |
| Cynthia Smith | $230.00 | 3.8 | $230.00 | 1.2 | $1,150.00 |
| Maha Saad | $220.00 | 7.6 | $255.00 | 8.6 | $3,865.00 |
| Debi Schrock | $90.00 | 2.2 | N/A | N/A | $198.00 |
| Totals | | 50.2 | | 13.7 | $17,115.50 |

Initially, the court had some reservations about the number of timekeepers seeking fee recovery—11 attorneys and five paralegals. A paying client might infer that this array manifests inefficiency. But the important words in that sentence are these three: a paying client. Plaintiff's counsel here didn't have such a client and they nonetheless volunteered to accept this

---

[6]   The court's research did not permit it to determine Mr. Wanglin's experience level. But comparing his hourly rate to the rates of other attorneys, the court infers that Mr. Wanglin's experience level is less than three years.

difficult representation.  In a professional environment where the bottom line often is the bottom line, the court declines to draw negative inferences about counsel who accept a significant pro bono assignment.  Moreover, this case is more complex than most pro bono cases.  Its geography spanned four states, and implicated each one's laws and three separate federal acts.  In these unusual circumstances, the court concludes that numerosity concerns do not impair the fee award.

This takes the analysis to the hourly rates used by plaintiff's fee request.  To determine whether the requested hourly rates are reasonable, the court must "determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time."  *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1256 (10th Cir. 1998) (quoting *Ramos*, 713 F.2d at 555); *Barbosa*, 2015 WL 4920292, at *9.  "The court should scrutinize [paralegals and legal assistants'] hours and the suggested rates in the same manner it scrutinizes lawyer time and rates."  *Case*, 157 F.3d at 1255 (quoting *Ramos*, 713 F.2d at 559).  And, the court "should base its hourly rate award on what the evidence shows the market commands for . . . analogous litigation."  *Id.* (citing *Beard v. Teska*, 31 F.3d 942, 955–57 (10th Cir. 1994), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Servs.*, 532 U.S. 598 (2001)).

Except for Ms. Chadwick, the court finds that the rates requested by plaintiff are higher than the billing rates commonly applied in Kansas.  *See, e.g*, *Fox*, 258 F. Supp. 3d at 1271 (Robinson, J.) (finding hourly rates of $400 and $375 reasonable for attorneys with 17 and 15 years of experience in a Title VII and Title IX case); *Barbosa v. Nat'l Beef Packing Co., LLC*, No. 12-2311-KHV, 2015 WL 4920292, at *10 (D. Kan. Aug. 18, 2015) (Vratil, J.) (finding hourly rates ranging from $180 to $425 reasonable, depending on each attorneys' level of

experience, in an FLSA case); *Seamands v. Sears Holding Corp.*, No. 09-2054-JWL, 2011 WL 884391, at \*14–16 (D. Kan. Mar. 11, 2011) (Lungstrum, J.) (finding the following hourly rates reasonable in a class action lawsuit for unpaid sales incentive compensation:  $400 per hour for a lawyer with more than 30 years' experience, $290 per hour for lawyers with more than 20 years' experience, $270 for a partner with 11 years' experience, and $175 for associates with "lesser experience").  Plaintiff provides the court with no basis to justify rates that exceed the norm for attorneys in the Kansas market.  And so, the court must reduce the attorneys' billing rates to a reasonable level.  Based on past rates for comparable experience and similar—but not identical—work, with some consideration for inflation, the court concludes the following rates are reasonable for the sophisticated work required by this case:  (1) $225 for the attorneys with four years (or fewer) experience; (2) $250 for the attorneys with five years of experience; (3) $200 for Gillian Chadwick; (4) $300 for Philip Chang; (5) $335 for Meghan Cloud; (6) $440 for Cristin Traylor; and (7) $475 for Jonathan Blank.

The court also must reduce the paralegals' rates to conform them to the local market.  Except for Ms. Schrock, the requested paralegal and legal assistant rates also are higher than those typically charged in this area.  The court is unable to discern the precise titles of Ms. Mason, Ms. Powell, Ms. Smith, Ms. Saad, and Ms. Schrock.  Plaintiff's submission lumps them together as "paralegal/legal assistant."  The only distinguishing factor is their rate—Ms. Schrock billed at a rate of $90 per hour while all the others billed over $200 per hour.  The court infers that Ms. Schrock is a legal assistant while Ms. Mason, Ms. Powell, Ms. Smith, and Ms. Saad are paralegals.

In 2017, our court found that $100 per hour was a reasonable rate for a legal assistant. *Bailes v. Lineage Logistics, LLC*, No. 15-2457-DDC-TJJ, 2017 WL 4758927, at \*8 (D. Kan. Oct.

20, 2017).  The court finds that no adjustment is necessary for Ms. Schrock's rate.  But the paralegals' rates exceed the norm for Kansas.  In 2016, our court found that $125 per hour was a reasonable rate for a paralegal.  *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F. Supp. 3d 1269, 1281 (D. Kan. 2016); *see also Barbosa*, 2015 WL 4920292, at *10 (reducing Kansas City paralegals' hourly rate from $100 per hour to $75 per hour).  The court believes it is appropriate to adjust to accommodate inflation.  The inflation rate for both 2016 and 2017 was 2.1%.  Kimberly Amadeo, *U.S. Inflation Rate by Year:  1929–2020*, The Balance (updated Jan. 15, 2018), https://www.thebalance.com/u-s-inflation-rate-history-by-year-and-forecast-3306093.  The court thus finds that a reasonable paralegal rate is $130.

Based on the analysis above, the court concludes that the correct lodestar calculation is summarized in the table below.

| Name | Total Hours Billed | Hourly Rate | Fee |
|---|---|---|---|
| Jonathan Blank | 16.3 | $475.00 | $7,742.50 |
| Cristin Traylor | 24.5 | $440.00 | $10,780.00 |
| Meghan Cloud | 7.3 | $335.00 | $2,445.50 |
| Phillip Chang | 12.5 | $300.00 | $3,750.00 |
| Gillian Chadwick | 23.7 | $200.00 | $4,740.00 |
| Lauren Mahaffey | 28.8 | $250.00 | $7,200.00 |
| Christopher McEachran | 41.9 | $250.00 | $10,475.00 |
| Katlyn Farrell | 30.6 | $250.00 | $7,650.00 |
| Elizabeth Hutson | 188.2 | $225.00 | $42,345.00 |
| Kayla Marshall | 15.3 | $225.00 | $3,442.50 |
| Brian Wanglin | 13.2 | $225.00 | $2,970.00 |

| Name | Total Hours Billed | Hourly Rate | Fee |
|---|---|---|---|
| Chelsea Mason | 1 | $130.00 | $130.00 |
| Bonnie Powell | 39.5 | $130.00 | $5,135.00 |
| Cynthia Smith | 5 | $130.00 | $650.00 |
| Maha Saad | 16.2 | $130.00 | $2,106.00 |
| Debi Schrock | 2.2 | $90.00 | $198.00 |
| **Lodestar Amount** | | | **$111,759.50** |

Next, the court turns to the *Johnson* factors.  *See Fox*, 258 F. Supp. 3d at 1254 ("Once the court determines the lodestar, it must then determine whether any upward or downward adjustments should be made to the lodestar to account for the particularities of the suit and its outcome [by considering the *Johnson* Factors]." (internal quotation marks and citation omitted)). Most of the factors are subsumed within the lodestar calculation.  *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563 (1986) (citing *Blum v. Stenson*, 465 U.S. 886, 898–901 (1984)).  Although the factors not subsumed can justify an upward departure from the lodestar amount, such modifications are reserved for "rare" and "exceptional" circumstances.  *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886 at 899).

None of the *Johnson* factors present an exceptional reason to depart from the lodestar amount.  The court thus finds that the lodestar amount is a reasonable one.  Accordingly, the court grants plaintiff's Motion for Attorneys' Fees and awards plaintiff $111,759.50 in attorneys' fees.

Plaintiff's motion also requests $5,424.84 in costs.  The court has reviewed the costs and finds that they are reasonable, all incurred during litigation of this case.  The court thus awards plaintiff $5,424.84 to compensate plaintiff's counsel's their reasonable costs.

## V.     Conclusion

The court grants plaintiff default judgment on all her claims.  The court also awards plaintiff $453,517.20 for restitution damages, $2,920,000 for emotional distress damages, $3,373,517.20 for punitive damages, $282,677.50 for liquidated damages, $907,034.40 for trebled RICO damages, and $1,800 for conversion damages.  Finally, the court awards plaintiff $117,184.34 for reasonable attorneys' fees and costs.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Motion for Default Judgment under Fed. R. Civ. P. 55(b)(2) (Doc. 23) is granted.

**IT IS FURTHER ORDERED THAT** judgment be entered in favor of plaintiff against defendants in the amount of $453,517.20 for restitution damages, $2,920,000 for emotional distress damages, $3,373,517.20 for punitive damages, $282,677.50 for liquidated damages, $907,034.40 for trebled RICO damages, and $1,800 for conversion damages.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion for Attorneys' Fees (Doc. 34) is granted.  The court awards plaintiff $117,184.34 for reasonable attorneys' fees and costs.

**IT IS SO ORDERED.**

**Dated this 23rd day of May, 2018, at Topeka, Kansas.**

**s/ Daniel D. Crabtree** _____
**Daniel D. Crabtree**
**United States District Judge**